Good morning your honors and may it please the court I'm Robert T. Ryan for petitioners Sobrian Abdul-Karim and Rohani Rohani her husband and wife and they are present in court today. Your honors I'd like to reserve two minutes for rebuttal. As we see it the main issue here is whether the substantial evidence compels the conclusion that no reasonable adjudicator would have denied asylum to Mr. Karim. Of course his wife is a derivative beneficiary of the asylum application. Mr. Karim is a 54 year old native and citizen of Indonesia. The IJ found that he is ethnic Chinese a Christian and that the Indonesian government required that he adopt an Indonesian name. The IJ also found that he had been self-employed as a florist in Indonesia later sold fruits and nuts in a store in Jakarta in 2000 before coming to the United States. He claims the protected asylum grounds of his Chinese ethnicity and his Christian religion. At the outset we note that the subjective component for asylum is satisfied because the immigration judge expressly found that both Mr. Karim and Miss Rohani were credible witnesses and under Selvi Ashraf the record shows that he is also a member of a significantly disfavored group of Indonesia's ethnic Chinese minority. Under the disfavored group analysis the more serious and widespread the threat to the group in general the less individualized the persecution needs to be and that's the sale case at 924 925. As a result Mr. Karim must demonstrate a comparatively low level of individualized risk in order to prove that he has a well-founded fear of future persecution. That's the sale case at 927. He is also a member of one... Can you explain the individualized risk in this case? The sale decision indicated some level of specific identification of the individual there that the crowds were calling those people out by name. Can you explain what the individualized risk is in this case? Yes I can Judge Ikuda. In this case Mr. Karim credibly testified that on February 23rd 1999 the separatist group the Freedom for Aceh Movement or GAM kidnapped him. After the kidnappers blindfolded and restrained him he offered the money but the kidnappers refused the offer and continued to hold him. The record also shows that the kidnappers demanded 750 million dollars rupiah, that's Indonesian currency of course, and held him in a hut for 21 days. During this ordeal the GAM members tortured and beat him with brass knuckles and that is a specific finding made by the immigration judge at page 48 of the record. Was that on account of a protected class? Yes Judge Ikuda it was because regarding the nexus to the protected ground of ethnicity he testified credibly that the GAM movement is one that supports itself by targeting ethnic Chinese and that's in the record at page 106. He heard, and this really gets to the nub of it, he heard the GAM members describe how they were attempting to steal Chinese owned lands. So there is a nexus to the protected ground of ethnicity in this case. Therefore he satisfies the individualized risk burden in this case and he is also shown past persecution given the beatings. In Sale there was no physical violence, in this case there was. This case on the facts is comparable at least to Sale. Didn't your client testify that he thought the reason he had been kidnapped was because he had money? Well that's correct Judge Fogle and the horrible truth in Indonesia is that the Chinese there are stereotyped. The Sale decision goes into that category. They are scapegoated because of their perceived wealth. So that's another point in support of our argument. But he didn't say, I don't think anywhere in the record that he thought the reason he was kidnapped was because he was Chinese. He said he was kidnapped because he had money and you're saying that the IJ should have inferred in the context of everything else here that he wouldn't have been suspected of being Chinese. He wouldn't have been suspected of having money if he hadn't been Chinese. Well that's correct and I think that the words in the context of everything else are very appropriate in this case, Judge Fogle. What about the fact that apparently the record shows that your client didn't even become a Christian until after he was already in captivity? Well he said that he essentially had an epiphany and he prayed in the Muslim way, he prayed in the Buddhist way and he prayed in the Christian way and I believe it was on the 8th day of his captivity when he was praying and later on he felt that he was more comfortable with the Christian way. Certainly that's a good thing, at least as I see it, that he found comfort in something but the kidnapping could not have been based on his religion. Well only to the extent that there's interplay between ethnicity and religion in Indonesia, it could be Buddhism which was his former religion which is about 1% of the population or Christianity which is about 10% of the population, about 87% of the population according to the record is Muslim. The IJ also did an analysis on discretionary factors in this case and I want to jump over to that. The IJ noted that one member of Mr. Karim's family, his son Danny, was residing in Indonesia at the time of the decision on August 20, 2002, however it's undisputed that his two daughters were residing in the United States at the time of that decision and of course his co-petitioner wife was residing here. Those are favorable factors. Those support his contention that he had fear and left Indonesia for that reason. Those were not weighed by the IJ. There is this adverse factors analysis within the discretionary factors analysis that the IJs go through but she didn't complete the analysis. I see there are about two minutes left on my time so I will reserve that time. Thank you. Good morning, Your Honors. My name is Kevin Conway and I am here to represent the Attorney General, Mikey McCasey, who is unfortunately not here in court today. What the government's position is that petitioners have failed to show that the evidence of record compels that the conclusion contrary to the one reached by the agency in this case and because the board affirmed that opinion we are basically looking at the immigration judge's decision. The government feels or the government thinks that the pivotal issue in this case is not so much whether or not there was any harm to Mr. Karim or to his co-petitioner but whether or not that harm was occasioned or on account of a protected ground under the INA, the Immigration and Nationality Act. The petitioner from the body of evidence that we have is the victim of three random acts of violence that were perpetrated over a period of time, over a period of a couple of years. The first incident took place after the petitioner had been paying extortion money to this group called the GAM and had demonstrated to the GAM an ability to pay. There is nothing in the record, nothing in the testimony of the petitioner on the record that indicates that the GAM was doing this or kidnapped him for any reason other than to extort money from him. In fact, I would take issue briefly with the petitioner's assertion that he offered them money once he was kidnapped. That doesn't appear in the record. He was requested or they required that he pay 750,000, 750 million rupiah which he was unable to do at the time but it appears from all indications that the reason that the GAM kidnapped him was to extort money from him. Yes, they did hold him for a period of time. Yes, they wanted to take money from him but also they knew or suspected that because he was ethnic Chinese that he would be in that wealthier group and have the money. So wouldn't that fall into our mixed motive line of cases? Well, I think, Your Honor, that the fact that he was ethnic Chinese only comes up or it was not a motivating factor according to the record of evidence. He had an established ability to pay. Now, they might have gone to him originally because he was a businessman and because there was a general understanding or general feeling in Indonesia that individuals who are of Chinese ethnicity have money. But in this case, it was a proven fact because he was able to pay them on those previous occasions. So, Sale goes through this analysis of why the ethnic Chinese are persecuted and part of it is that they're better off economically situated than the Indonesian natives. So, what are we to make from that? Well, again, I think it's not because he was ethnic Chinese that he was kidnapped. It was he was kidnapped because he had already demonstrated an ability to pay extortion money or money to this particular group. And where is that? Where does he testify that in the record? That he had already been paying the money, JM money. Page 101 and 102, when he was asked in court why it was that he thought he was kidnapped and he states, because I have a business for forest and goods and they always ask me money. I give them money about 300, 200,000 rupiah. It's no matter for me. And that's prior to the kidnapping incident itself. The second incident, I'm sorry, did that answer your question? It does. The second incident that the petitioner complains of involves an incident on a bus where a gun was put to his head. Now, in the record, he talks about the fact that he was singled out on this bus. Petitioners in his brief notes or points to the fact that he was the only Chinese individual on the bus. However, when the petitioner was asked why it was that he was singled out, he states on the record that it was because they thought he was in the military because of his short haircut. Never did he testify that it was because he was Chinese. And even on cross-examination, he confirmed that by saying, when asked, did they say anything to you? And he said, you are military. It's probably an inferred pronunciation of that, but that's what he said. So there again, it does not indicate that he was targeted because he was of Chinese ethnicity, even though he might have appeared to be. By his own testimony, he states that he was targeted. And he wasn't harmed, but he was targeted because they thought he was in the military. And again, he states that it's the G.A.M. that was the individual, or he believes it was the G.A.M., although there's no other evidence to indicate that that's who it was. And the third incident, which occurred in November of 2000, he and his wife were driving on their way to church and got a flat tire. Now, by the testimony, it was in an area that was a bad area, however that is defined. The individuals who accosted him said that, and the petitioner testified that way. And once the individuals came up upon him, they robbed him. Now, there isn't any indication in the record that that was because of either his ethnicity or his religion. They didn't know at the time, or there's no indication at the time, that they knew that he was of Christian faith. He probably was obviously of Chinese ethnicity, but there's nothing to indicate that if he was not, then he would not have been robbed. According to the record of evidence, it appears that he was nothing more than, he and his wife were nothing more than targets of opportunity in a bad situation. The petitioner argues in his brief that a reasonable inference may be drawn that because the petitioner is ethnic Chinese that they are at greater risk of persecution. And that may very well be, however, a criminal act, which happened on two at least out of the three occasions. All of the occasions were actually criminal acts, but on the final two, the last two occasions, those were not persecution as defined under the Immigration and Nationality Act. There is evidence that suggests, like I said before, that the petitions were nothing more than targets of opportunity. And it certainly does not compel a conclusion contrary to what the IJ found in her decision. Could you address the Kath claim? Is the GAM, do they operate with the acquiescence of the government, or at least the government is unable to control their activities? I don't believe that the GAM acts with the acquiescence of the government. I think that in the country report, it's clear that there have been steps taken to try and combat the GAM. And there is clearly a lot of fighting going on, in-fighting, inter-religious fighting, inter-racial fighting or inter-ethnic fighting going on in Indonesia, in certain parts of Indonesia, not in all parts of Indonesia. I don't know that the government is unable to control them. In certain areas, they have taken more steps. The GAM mainly operates in, I think it's Shea County or Shea Province. So that would indicate that they are working towards, to minimize the effects. But again, they haven't completely stamped out the ability of the GAM to perform acts. And they're not the only ones who apparently operate in Indonesia to perform criminal acts. How does the BIA interpret the standard from SAIL where it says if you prove that you're in a disfavored group, that you have a comparably low level of individualized risk that you need to come up with? What is the level that the BIA thinks would be sufficient? As it relates to this case, I think that, well, my understanding is that in order, if you are a member of a disfavored group, yes, you have a lower individualized risk, but you still must show some risk of persecution on an individual basis. And based on the record in this case, the petitioners have not shown that they were persecuted because of one of the enumerated grounds under the INA. So is that what individual, I mean, it seems to me that the enumerated ground is taken care of by the disfavored group. Just bear with me for a second. I'm trying to figure this out. We have this in a lot of cases. The fact that he belongs to a disfavored group, which I think you probably agree that he belongs to a disfavored group in Indonesia. Once we make that finding, then we look to see, you know, then there's now a lowered standard of individualized risk of persecution to determine that he would be entitled to asylum. So here, I don't know what they mean by low level of individualized risk. Does it, that's what I'm struggling with. What does that mean? Because now we're, that's sort of, that's the persecution problem. That's not the on account of problem. Right, but persecution has to be on account of. Sales analysis, I'm sorry. I'm sorry, but I'm saying that persecution has to be on account of one of the enumerated grounds anyways. And I think that what the individualized risk comes in, where in the first low long case, the pre-sale, the disfavored group analysis came in and took the place of that individualized risk to a certain extent. Is that a pattern and practice case or a disfavored group case? It was a pattern and practice case. Are they the same? Well, I think that you have to, the pattern and practice is what gives you the ability to have the lower individualized risk. Okay, so. If you are a member of a disfavored group and there was a pattern and practice of persecution against that disfavored group, then you have to show a lower individualized risk of persecution. I'm not sure that's been quantified yet as to what. I know, so lower level of individualized risk. What, hypothetically, what kind of showing would have to be made here to meet that standard? I think that the petitioner in this case has to show that any harm that came to him, came to him because on account of one of the enumerated grounds in order to show persecution at all. In his opposition, that he has not shown that these, that the harm that did come to him, and we're not arguing that at least with the GAM, the kidnapping, that some harm did not come to him. What we're saying is that that was not on account of one of the grounds, either race, I mean, ethnicity or religion. Had that been the case, he may have been able to show that his individualized risk was lower because he was in a disfavored group. Well, suppose that when the GAM kidnapped him, they yelled at him, you're a Chinese, go home, we don't want you, and did all the exact same things. I don't know if that would have necessarily risen to the level, you know, to show that it was on account of his ethnicity because of the fact that he was, their main goal, and it appears from the record that their main goal was still to build up money for him. They weren't persecuting him because he was Chinese. They were persecuting him because they wanted something from him, and that was money. And that is shown by the fact that once they held him for a certain amount of time and it became clear that they weren't going to get any more money, that they took the money that they could and released him. My reading from a lot of the country reports is that the GAM, on many occasions, kill their captors, their captives, sorry. And in this particular case, they did not. They released him, perhaps, and this might be a speculation on my part, perhaps because he does have an ability to pay and would be able to pay in the future and they didn't want to. Well, I don't want to be glib, but I hope you're not arguing that he'd have to be dead before he could be eligible for asylum under the disfavored group analysis. No, that would probably be an extreme requirement. Yeah, we've got these cases and now we have to say, okay, does he fit within this or not? And part of your analysis is, well, they let him go. I'm not saying that because they let him go, he wasn't persecuted. I'm saying that because they let him go, they were expecting they could maybe get more money in the future. Or that they were not persecuting him because he was Chinese or of Chinese ancestry or descent. There was another reason for it, and that reason is what allowed the immigration judge to find that he was not on an enumerated ground. Okay. Thank you. Thank you. Your Honor, if I may go back to 102 of the record. It is a bit ambiguous. If I can quote briefly. I was kidnapped. This is his testimony. Okay, and who was it that kidnapped you? It's a member of J.A.M. J.A.M. is the liberating movement for freedom, liberty, freedom, liberty. And why is it that they would kidnap you, sir? Because I have business for forest and goods, and they always ask me money. I give them money, about 300 or 200,000 rupees. It's not no matter for me. And for that incident, they asked me to have coffee, and when after I had coffee, they then asked me to walk.  They took me to the forest. And on the road to that direction, they cover my head. So that's where the offer comes in. In terms of the second incident, he was the only, this is the March 2000 incident, while riding the bus between Aceh and Medan. He was the only Chinese on the bus. So one can reasonably infer from that that he was targeted by the native Indonesians when they put a gun to his head. But that wasn't his inference, right? His inference was they thought that I am a military. This is on, this is the incident out of March 2000. 2000 on the bus. Well, that's his testimony. But the fact that he's Chinese, invisibly Chinese, we think lends to a reasonable inference on that particular point, Judge Ikuda. Also in the sale decision at 926, if I may quote briefly, the economic success of some Chinese is used as a convenient recent justification for anti-Chinese sentiment. It has remained constant even as periods of social and political unrest have alternated with periods of relative calm. That sentiment emerges at times of social upheaval when ethnic Chinese are often made the scapegoats for Indonesia's economic and political problems, end of quote. If there are no more questions, I'll just submit. Thank you. Thank you very much. Kareem v. McKasey is submitted, and we'll take up the next case with Jaira v. McKasey.
judges: Wardlaw, Ikuta, Fogel